HEINRICH PEESE v. ANTONIA GELLERMAN ET AL.

Decided May 13, 1908.

**1.—Parent and Child—Gift of Child—Custody of Child—Pleading and Evidence.**

While the proposition may be correct that a parent has no such property interest in his child as may be given away, and that he can not relieve himself of his parental obligations to the child, still when a father has attempted to give his infant daughter to her aunt, and has voluntarily surrendered the control of his child for the first seven or eight years of its life, and permitted such aunt to exclusively feed, clothe and care for it, the courts, upon the application of the father to obtain possession of the child, will consider the attempted gift together with the other evidence in arriving at a conclusion as to where the custody of the child should be placed.

**2.—Same—Immoral Influences.**

In an action by a father to recover the possession and custody of his daughter from an aunt who had had possession and custody of the child from its infancy until it was eight years of age, the fact that the reputation of the father's wife, the child's stepmother, for chastity was bad, was a matter proper to be plead in defense by the aunt and to be considered by the court in awarding the custody of the child. The welfare and best interests of the child should be in the prime considerations. Evidence considered, and a judgment denying to a father the custody of his minor daughter, sustained. Justice Neill dissenting.

Appeal from the District Court of Gillespie County. Tried below before C. Martin.

*Moursund & Moursund,* for appellant.

No brief for appellees.

FLY, ASSOCIATE JUSTICE.—This is a suit for the custody of a child, instituted by appellant, the father of the child, against appellees. A trial was had without a jury, and the custody of the child was given to appellees, the right to visit her being accorded appellant.

Elise Peese, the child in controversy, is the daughter of appellant, and is about eight years of age. Her mother died in a few minutes after her birth, and the child was placed in the hands of her aunt, Antonia Gellerman, and her husband, August Gellerman. They have since that time treated her as one of their children, and a strong mutual attachment exists between them. Appellees are honest, upright and industrious people, living on a farm which they own. They have supported and cared for the child all its life, and are in a position to support, maintain and educate her. Appellant had done very little towards the support of the child. There was evidence tending to show that the child was given by appellant to her aunt, Mrs. Antonia Gellerman, and he laid no claim to her, and did not desire her custody until after he had married again. His present wife is about twenty years of age and has an

illegitimate child two or three years old.  She lived in the house with appellant and kept house for him for several months prior to their marriage.  Several witnesses swore to her bad reputation, and stated that it was in connection with the birth of her child.  One witness stated that he had heard talk of her bad conduct since that time.

It was alleged in the answer that a gift of the child was made by her father to her aunt, and the subject of the first assignment of error is the overruling of an exception to that allegation.  The proposition is that the parent has no property interest in his child which is subject to be given away, and that he cannot relieve himself of his parental obligations to the child.  While the proposition may be a correct one, and while standing alone an attempted gift of a child would be invalid, still the fact of the gift having been made would place the parent in the attitude of invoking the powers of a court of equity in seeking to regain possession of the child.  Such being the case, the matter of the gift of the child was properly alleged, and properly considered with the other facts in arriving at a conclusion as to where the custody of the child should be placed.  Legate v. Legate, 87 Texas, 248.  The force of the opinion cited is parried in a later case by the Supreme Court (State v. Deaton, 93 Texas, 243), but the allegation can be justified by the language of the last decision.  The court said: "When the parent has parted with the possession and control of his or her child, and seeks to regain that possession through the courts, it becomes the duty of the court, in a proper case, to protect the child against the evil results that may flow to it from an improper direction through incompetent or disqualified parents."  If the transfer of the custody of the child should be considered in trying the case it can not be improper to allege it.  If a man has voluntarily surrendered the control of his child for the first seven or eight years of its life, and permitted someone else to feed, clothe and care for it, there is not much room for any sentimental dissertation on the subject of a court sundering the ties existing between the father and child.  It is unfortunately the case that these ties are sometimes forgotten and disregarded until the child has reached an age when it may be useful to the parent, and then they are invoked.  Such resurrected affection may well be viewed with suspicion, and the parent should be required to show that the interest of the child will be subserved by having its custody returned.  If the doctrine of the Missouri case, cited with approval in the case of State v. Deaton, to the effect that, when a father sues for the custody of a child, no burden would rest upon him, except to prove the relationship, be the true one, still, when it appears that he has voluntarily parted with the custody of his child, contributed little or nothing to its support, and allowed someone else to do what he should have done, it seems that any presumption that might arise as to his peculiar fitness to rear the child would be destroyed, and that he would then be required to establish his superior fitness before he could be awarded its custody.  There is no basis for a presumption that the promptings of parental affection will cause a father to tenderly care for his child in the future when he has failed to so act in the past.

It was alleged in the answer that the wife of appellant was not a woman of good reputation, and that, although she was not married prior to her marriage with appellant, she had given birth to a child, and that

she was not a suitable person to care for and advise a girl. We are of opinion that the court did not err in refusing to strike out the allegation. The allegations were pertinent to the question of the interest of the child being subserved by giving her into the custody of her father, who had presiding over his household a woman who had lived the life alleged. It may be that the woman had reformed, but the fact remained for consideration that she had made the most grievous error that a woman can make, and that the offspring of that fall from decency and virtue was an inmate of the household into which this young girl was to be transferred. She would be under the tutelage and direction of a woman who had failed to direct her own footsteps in the paths of pure womanhood, and would be thrown into the most intimate association with the child of the weakness and vice of the woman to whom she would be compelled to look for advice and counsel. The facts alleged were proper to be considered in arriving at a correct conclusion as to the custody of the child.

The third assignment of error questions the action of the court on an exception to the alternative plea for compensation for caring for the child in case her custody was awarded to appellant. In view of the fact that the custody of the child was awarded to appellees, and no judgment for any sum of money was rendered for them, the question as to the cross-action becomes a mere abstraction, and we suppose would not have been insisted upon except on the hypothesis that the case would be remanded for another trial.

The fourth assignment of error questions the sufficiency of the evidence to sustain the judgment of the court, and is answered in the negative by our conclusions of fact. The judgment is affirmed.

### ON MOTION FOR REHEARING:

It was not at all necessary for the great array of authorities to be cited to show this court that, as a general rule, it is contrary to the policy of the law to permit a parent to release his authority to control the person of his child during its minority, for the law enjoins upon the parent to support, educate and maintain his child, and the law does not tolerate such release of authority. However, there is much authority for the rule that when, by reason of the death of the mother, a child is too young to be properly cared for by the father, and it is intrusted to others to be reared, still, notwithstanding the fact that the father cannot delegate his authority to control the child, as a general rule, yet if the best interests of the child require that it remain, either permanently or for a certain time, with its foster parents, the father will be denied the custody of the child. After the child has become thoroughly fitted into its surroundings, and is attached to its foster parents, and has become endeared to them, it might be the refinement of cruelty to break up the tender relations and destroy happy associations merely to carry out a sentimental theory about the brutality of disturbing the strongest, purest and holiest love of a father for his daughter. It may be true, generally, that the father should have control of his child, but at times it is a delusion and a snare, and the law looks to the facts of each case, and looks to the peace, comfort and happiness of the child, rather than

to indulging in fancied theories about every father loving his child, and, regardless of circumstances, entitled to its custody. *In re* Snook (Kan.), 38 Pac., 272; Filbert v. Schroeder (Neb.), 56 N. W., 307; Cunningham v. Barnes (W. Va.), 17 S. E., 308; *In re* Stockman (Mich.), 38 N. W., 876; Washaw v. Gimble (Ark.), 7 S. W., 389; Green v. Campbell (W. Va.), 14 S. E., 212; Sheers v. Stein (Wis.), 43 N. W., 728; Jones v. Darnall (Ind.), 2 N. E., 229; Townsend v. Warren (Ga.), 24 S. E., 960; Bonnett v. Bonnett (Iowa), 16 N. W., 91. To the same effect, in Texas, is the well-considered case of Legate v. Legate, 87 Texas, 248.

Nothing that we could say would be more applicable to the facts of this case than the following language used in the Legate case: "Ordinarily the law presumes that the best interest of the child will be subserved by allowing it to remain in the custody of the parents, no matter how poor and humble they·may be, though wealth and worldly advancement may be offered in the home of another. Where, however, a parent, by writing or otherwise, has voluntarily transferred and delivered his minor child into the custody and under the control of another, as in the case at bar, and then seeks to recover possession of the child by writ of *habeas corpus,* such person is invoking the exercise of the equitable discretion of the court to disrupt private domestic relations which he has voluntarily brought about, and the court will not grant the relief unless, upon a hearing of all the facts, it is of the opinion that the best interests of the child would be promoted. It is sometimes said that such a voluntary transfer is void, or that it is 'contrary to public policy,' but the cases using such language show that it is not used in an absolute sense, but in the sense that such transfer is no impediment to the action of the court in determining what is best for the interest of the child. The law does not prohibit such a transfer, but, on the contrary, allows the child to reap the benefit thereof when it is to its interest so to do." In other words, when endeavoring to uphold the sacred ties existing between the father and child, we must not forget the comfort, happiness and high interests of the young child, whose affections have become entwined about those who have tenderly cared for it, and who are capable of still caring for it and rearing it properly. Which home is best for the child, as said in Legate v. Legate, is a question of fact to be determined primarily by the trial court, and it has in this instance been determined by the learned judge who tried the cause that the best interests of the child will be promoted by allowing it to remain in the home of its young affections, rather than to place it in a home with a strange stepmother whose past life is marred, as hers was shown to be.

It may be, as is stated, that the father in this instance is an upright and honest man, and that he is financially able to take care of the child, but necessarily the care and rearing of the young girl in controversy, if carried to his home, must devolve, to a great extent, upon the frail young woman who has been chosen by the father to preside over his household, and, while the mantle of Christian charity may be thrown over her sad lapse from the path of virtue, still it should not be stretched far enough to place the moulding of a young girl's life in her hands. Every doubt should be resolved in favor of the child's welfare and happiness and future moral training. The motion for rehearing is overruled.

*Affirmed.*

*Dissenting Opinion by* NEILL, ASSOCIATE JUSTICE.—I believe that, under the law and facts in this case, the appellant has the right to take his little daughter home and treat her as a member of his family. I think he has this right, because the God of nature has given it to enable him to discharge the duty he owes as a father to his child. Where a right emanates from such a source the one to whom it is given, if fit to perform the duty it imposes, cannot be rightfully deprived of it by the courts of any country. The law itself recognizes the right primarily of the parent to the custody of his minor child, and but re-echoes the voice of nature in the duty it imposes. The mother of the child being dead, the presumption is that its father has the right to its custody, and it devolves upon the party claiming adversely to it to show that it has been forfeited by him; that is, it must be proved the father is not a fit person to rear and nurture his own child. This must be shown by facts, and not by ethereal sentiment. State v. Deaton, 93 Texas, 247.

Even if it were proved—which was not—that appellant gave the child to appellees, it would amount to nothing, for the custody of a child is not the subject of gift or barter. A father cannot, by mere gift of his child, release himself from his obligation to support, nurture and educate it, or deprive himself of his right to its custody, which would prevent him from discharging those duties to his offspring that God has commanded him to perform and which the law cannot rightfully compel him to disobey. Washaw v. Gimble, 50 Ark., 351; Chapsky v. Wood, 26 Kan., 650; 40 Am. Rep., 32; *Re* Scarritt, 76 Mo., 565; 43 Am. Rep., 768; State v. Baldwin, 5 N. J. Eq., 454; 45 Am. Dec., 397; People v. Chegaray, 18 Wend., 637; People v. Mercein, 8 Page, 47; 3 Hill, 399; Mercein v. People, 25 Wend., 64; Brooke v. Logan, 112 Ind., 183; Jones v. Darnall, 103 Ind., 569; State v. Nachtwey, 43 Iowa, 653. Even the right of a parent's guardianship of the person of his minor child cannot be assigned so as to prevent the parent from revoking such an assignment. Cook v. Bybee, 24 Texas, 278; Byrne v. Love, 14 Texas, 81. The law, as enunciated by the Supreme Court in State v. Deaton, 93 Texas, 243, is in perfect accord with the authorities cited from other jurisdictions. Therefore the idea that a gift by the appellant of his child to the appellee militates against his superior right to its custody should be laid out of view entirely, and the case determined by the law as it stands.

Theoretically the State, through its appropriate organs of government, is the guardian of the children within its borders. While this is true, in practice as well as in theory, still the principle that the natural right vests in parents to the custody and control of their children remains, and is only impaired when the welfare of society or of the children themselves come in conflict with it. When there is such a conflict the supreme right of guardianship of the State asserts itself for the protection of society and the promotion of the welfare of the wards of the State. Van Walters v. Board of Guardians, 132 Ind., 567; 32 N. E., 586.

In view of these principles, it seems to me that the question to be determined is, Does the evidence in this case show that the welfare of society or of Elise Peese demand that the State should withhold from the father the custody of his child and give it to the appellee? In consid-

ering this question I shall regard the welfare of the State and of the child as the same, for it is to the interest of the State that every girl within its borders should be so cared for as to bring her up as a good and useful woman, and it is best for every girl that she should grow into such a woman. No one can take the place of a good mother in bringing up and fitting a daughter for the duties of life; but the God who gave the appellant this child, in the gift, took from him his wife and her mother. Next to a good mother is a good father, for I believe the strongest, purest, holiest, the most devout and unselfish love that was ever planted in the breast of man is the love of a father for his daughter. It is a love too holy to be blighted and turned into grief by the law's taking her from his arms and placing her in the home of a stranger, where he is only allowed to see her by the courtesy of the court, among those by whom she has been taught to dislike him, and, instead of the endearing name of father, to call him "uncle."

If the evidence tended to show he were a bad man, or by misconduct had forfeited to the State the right which nature has given him to the care and custody of his child, I wouldn't say anything against the judgment of the court. But every syllable of the evidence shows that he is a good man—moral, upright, honest and industrious, and kind and affectionate to the members of his family. He has a farm and a comfortable home, and, from a pecuniary standpoint, is better able to take care of his child than the appellees. I believe, too, that the evidence shows that his present wife is a good woman. It is true—a lamentable fact—that, when she was about eighteen years old she was the victim of a seducer, and bore, as evidence of her love and misplaced confidence in the author of her ruin, a child. And the neighbors talk about her; people will talk. They have talked about Mary Magdalene for nearly nineteen hundred years, though she loved and was beloved by our Savior. Such is "the rarity of Christian charity" that the name of an innocent maiden, torn from her friends and companions and ravished by a Norman prince, is written in King James' translation of the Bible as the word *harlot*. Yes, people will talk, though few men, if as honest as of yore, can be found to "throw the first stone" at an erring woman. From the way I read the evidence, all the talk about appellant's wife is referable to the misfortune that befell her when she herself was more a child than a woman. Can society never forgive a woman "caught in the very act?" God has; and I think the law, administered by men, if it has any mantle of charity to spread, should spread it over a woman who has been betrayed by a man, and afterwards has lived a virtuous life, has married and made a good wife, and not, as though she were a moral leper, cry out "unclean! unclean" whenever she appears before its courts.

There is nothing in the evidence to indicate that Elise will be contaminated by being brought up in her father's family where she belongs; and I think her welfare requires that he should have the custody of her. As to what the law means by the best interest of the child, see Hibbett v. Bains, 78 Miss., 695; 29 So. Rep., 80.

*Affirmed.*

Writ of error refused.